UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES E. MITCHELL, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:15-cv-01881-JMS-DML |
| | ) | |
| MUNCIE COMMUNITY SCHOOLS, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

*Pro se* Plaintiff James Mitchell, who is African American, worked as a custodian for Defendant Muncie Community Schools ("MCS") for a little over six years. During his tenure, Mr. Mitchell was disciplined numerous times for various reasons. In January 2015, after he was involved in a heated argument with a co-worker, Mr. Mitchell's employment was terminated. Subsequently, Mr. Mitchell brought this lawsuit against MCS, alleging a claim for race discrimination and a claim for retaliation based in part on charges he filed with the Equal Employment Opportunity Commission ("EEOC"). Mr. Mitchell moved for summary judgment, [Filing No. 64], MCS cross-moved for summary judgment, [Filing No. 65], and both motions are now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### EVIDENTIARY ISSUES

Before setting forth the facts relevant to the pending motions and analyzing the parties' substantive arguments, the Court will consider Mr. Mitchell's April 24, 2017 letter to the Court including additional exhibits, which the Court treats as a Motion to Include Exhibits With Summary Judgment Response, [Filing No. 76], and MCS's objections to certain evidence relied upon by Mr. Mitchell, [*see* Filing No. 72 at 5-11]. This is necessary because Mr. Mitchell's motion and MCS's objections relate to the scope of information that the Court could consider in deciding the Motions for Summary Judgment.

## A. Motion to Include Exhibits

Twelve days after filing his response to MCS's Motion for Summary Judgment, Mr. Mitchell submitted a letter to the Court in which he stated that he "just noticed that I still had some extra exhibits in my copies that didn't get attached to my response. I am sending them now in hopes that they will be considered with the other documents." [Filing No. 76.] Mr. Mitchell submitted Exhibits 7, 9, 10, 11, 14, 16, 17, 23, and 24 with the letter. [Filing No. 76-1.]

MCS responds to Mr. Mitchell's letter – which the Court is treating as a motion – by arguing that the exhibits should not be considered because the deadline for Mr. Mitchell's response to MCS's Motion for Summary Judgment had passed, that the exhibits do not contain information that was discovered after that deadline, and that Exhibit 9 lacks proper foundation and is inadmissible hearsay. [Filing No. 77 at 2-3.]

The Court notes that two of the exhibits that are the subject of Mr. Mitchell's motion have previously been submitted in connection with other briefs on the Cross-Motions for Summary Judgment, including Exhibit 14 (previously filed at Filing No. 64-5 at 4 and Filing No. 74-1 at 8) and Exhibit 23 (previously filed at Filing No. 74-1 at 23). Mr. Mitchell's Motion to Include is **DENIED AS MOOT** as to Exhibits 14 and 23.[1] Exhibit 9 (handwritten notes), also included in the motion, is not properly authenticated so it is inadmissible, and the Motion to Include is **DENIED** as to that exhibit. Still other exhibits are not relevant to Mr. Mitchell's claims, including Exhibit 11 (a letter from Mr. Mitchell's former counsel to Mr. Mitchell outlining his representation and fee arrangement), Exhibit 16 (an email message from Mark Burkhart to several individuals

---

[1] Exhibits 14 and 23 contain some handwritten notations, such as asterisks and underlining that the previously-filed versions do not. Mr. Mitchell has not explained who made those notations and the Court does not find them significant.

stating that Mr. Mitchell "has received no medical treatment for his employment injury since January 22, 2014" – Mr. Mitchell's claims in this lawsuit do not relate to any injury), and Exhibit 24 (an email message from MCS's counsel to the EEOC regarding MCS's determination not to participate in a mediation). Mr. Mitchell's motion is **DENIED** as to those exhibits.

As to the remaining exhibits, the Court notes that they were filed after the deadline for Mr. Mitchell's response to MCS's Motion for Summary Judgment had expired. Because Mr. Mitchell is proceeding *pro se*, however, the Court will provide some leniency as to the deadline for his response brief and will consider the remaining exhibits. *See Patterson v. Brady*, 131 F.R.D. 679, 683 (S.D. Ind. 1990) ("In the Seventh Circuit the district courts are required to be lenient with *pro se* litigants and to ensure that justice is done on the merits rather than on the basis of procedural technicalities wherever possible"). The Court finds this particularly appropriate since MCS only objected to those exhibits on timeliness grounds, and did not argue that they are otherwise inadmissible. Accordingly, the Court **GRANTS** the Motion to Include, [Filing No. 76], as to Exhibits 7, 10, and 17.

### B. Admissibility of Certain Evidence

In its response to Mr. Mitchell's Motion for Summary Judgment, MCS argues that certain evidence should not be considered by the Court for several reasons. First, MCS argues that Mr. Mitchell makes "bald, unverifiable statements" that are not supported by record evidence. [Filing No. 72 at 5.] The Court is well aware of the summary judgment standard, and specifically of the principle that a party must support an asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). The Court will only consider facts that are supported by record evidence.

Second, MCS contends that Mr. Mitchell does not cite with particularity where to find certain information in the record, and discusses information that is immaterial and irrelevant. [Filing No. 72 at 9.] The Court is under no obligation to "scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898, and will not do so here. Further, the Court will only consider facts that are material to the decision.

Third, MCS argues that several of Mr. Mitchell's exhibits are inadmissible hearsay and should not be considered. [Filing No. 72 at 10-11.] Specifically, MCS objects to certain hand-written notes on an exhibit containing a June 2, 2009 letter from Mr. Mitchell to Associate Super-intendent Burkhart, an April 16, 2010 letter from Mr. Mitchell to Tom Jarvis, the Athletic Director at Central High School, an April 13, 2013 letter from Mr. Mitchell titled "RE: Performance Cor-rection Notice April 11, 2013," and an October 17, 2012 memo from Lon Sloan, Director of Hu-man Resources at MCS, to Mr. Mitchell. [Filing No. 64-5; Filing No. 64-8.] Because MCS acknowledges that these documents "reside[ ] in Mr. Mitchell's personnel file," [Filing No. 72 at 10-11], the Court will consider the exhibits, but will not consider the handwritten notes on the exhibits. MCS has provided a Declaration from DiLynn Phelps, Interim Director of Human Re-sources at MCS, which states that the letters and memos MCS has in Mr. Mitchell's personnel file do not contain the handwritten notes that appear on the versions of those documents Mr. Mitchell filed with his Motion for Summary Judgment. [*See* Filing No. 71-6 at 2.] Because Mr. Mitchell has not authenticated the versions of the documents he filed with handwritten notes, the Court will not consider the handwritten notes. It will, however, consider the documents that appear in Mr. Mitchell's personnel file at MCS. MCS also objects to the admissibility of handwritten notes purportedly made by Mr. Mitchell on June 9, 2010 and June 14, 2010, [Filing No. 64-7]. Because

Mr. Mitchell has not provided any authentication for these handwritten notes, the Court cannot discern whether they were notes made by him or some other individual. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is"). Accordingly, the Court will not consider Mr. Mitchell's exhibit at Filing No. 64-7 because it is not properly authenticated.

### III.
#### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above, and in light of the Court's evidentiary rulings. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. MCS Policies and Procedures

MCS has adopted an anti-discrimination policy which provides:

#### EQUAL EMPLOYMENT OPPORTUNITY

The School Board complies with all federal, state and local laws and regulations prohibiting discrimination. No employee or candidate for employment shall, on the basis of race, creed, color, sex, religion, national or ethnic origin, age, marital status, disability or status as a disabled veteran or Vietnam era veteran, be discriminated against, excluded from participation in, denied the benefits of, or otherwise be subjected to, discrimination in any term or condition of employment with the Muncie Community Schools.

The Superintendent shall appoint a compliance officer whose responsibility is to ensure that the Corporation complies with all federal, state and local anti-discrimination laws and regulations and that any complaints of unlawful discrimination are dealt with promptly. The compliance officer is also responsible for external and internal dissemination of the Corporation's anti-discrimination policies and provides employee training on these policies.

[Filing No. 65-1 at 85.]  Additionally, MCS's Employee Handbook provides a procedure for employees to follow if they believe they have been a victim of unlawful harassment:

**D. Complaint Procedure**

If an employee believes he or she has been the victim of unlawful harassment (including sexual harassment) or if an employee has questions or concerns about this issue, the employee should seek the help of another teacher, a counselor, his or her immediate supervisor, one of the building administrators or the Title IX Coordinator. The employee may make a written complaint to a building administrator or the Title IX Coordinator of the School Corporation. An employee always has the option of reporting the conduct directly to the Superintendent of the School Corporation if he or she prefers.

All allegations of unlawful harassment, written or verbal, will be treated seriously. The Corporation will immediately conduct a thorough, timely and impartial investigation. Upon the conclusion of its investigation, the Corporation will advise the involved parties of the allegations, its findings, and any steps taken to prevent further occurrences.

[Filing No. 65-1 at 95.]

### B.  Mr. Mitchell's Initial Employment With MCS – 2008-2009 School Year

Mr. Mitchell began working as a custodian for MCS, assigned to Central High School, on December 10, 2008.  [Filing No. 65-1 at 7.]  His direct supervisor was Joseph Martinez.  [Filing No. 65-4 at 14-15.]  Shortly after being hired, Mr. Mitchell signed an Acknowledgement of Receipt of Employee Handbook.

ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK

Muncie Community Schools

I acknowledge that I have received a copy of Muncie Community Schools' Employee Handbook and I understand that it is my responsibility to be familiar with all the information in the Handbook. I understand that it is not a contract of employment but is a set of guidelines for the implementation of personnel policies and practices. I understand that the provisions of this Handbook may be changed by Muncie Community Schools in the future without advance notice.

Employee Signature: _____

Date: _____

Building & Position: _____

[Filing No. 65-1 at 8.]

Just over a month after Mr. Mitchell was hired, Central High School Principal Chris Smith and Assistant Principal Suzanne Crump met with Mr. Mitchell about "concerns that were brought to [their] attention concerning overtime and whether or not [Mr. Mitchell] really wanted to work in this building." [Filing No. 65-1 at 10.] Mr. Smith and Ms. Crump also discussed with Mr. Mitchell a report that Mr. Mitchell wanted to be transferred to another building, and "concern about his willingness to help cover an area that was open." [Filing No. 65-1 at 10.] Ms. Crump met again with Mr. Mitchell on February 23, 2009, and told him that if his work was not satisfactory, "it would reflect on [his] job performance." [Filing No. 65-1 at 11.] John Hill, one of Mr. Mitchell's fellow custodians, stated in a Declaration that two other custodians "trashed [Mr. Mitchell's] area that he cleaned during overtime that caused him to get written up by Suzanne Crump in the early months of 2009." [Filing No. 75-1 at 3.]

- 9 -

Numerous other concerns arose during the 2008-2009 school year that Ms. Crump documented, including: that Mr. Mitchell told a staff member "this is where I hang out on days like this" in reference to the faculty workout room; that Mr. Mitchell was seen in the faculty workout room watching television with his shoes off and "did not do trash or restrooms [like] he was suppose[d] to do on Sunday the 8th during his overtime hours"; that math teachers complained that their white boards had not been cleaned, which was Mr. Mitchell's responsibility; and that Mr. Mitchell did not complete numerous tasks he was supposed to complete during a Sunday that he was working overtime. [Filing No. 65-1 at 10-12.]

Ms. Crump wrote Mr. Mitchell a Letter of Reprimand on June 1, 2009, which outlined several tasks Mr. Mitchell had failed to complete and stated "[f]uture violations of this matter on your part may lead to further disciplinary action up to and including dismissal." [Filing No. 65-1 at 9.] Mr. Mitchell signed the Letter of Reprimand, acknowledging receipt. [Filing No. 65-1 at 9.] Also on June 1, 2009, Ms. Crump completed a Custodial/Maintenance Staff Evaluation Form indicating that Mr. Mitchell received a "POOR" rating in several categories, including attitude toward the work, personal improvement in the work, reliability, accepts full responsibility for the job, cooperates with maintenance personnel, uses spare time in doing needed work, performs housekeeping duties that are not on daily schedule, and care for the security and protection of the building. [Filing No. 65-1 at 13-14.] Mr. Mitchell did not receive any "SUPERIOR" ratings, and only a few "GOOD" ratings – for dress, personal cleanliness, and keeps regular assigned working hours. [Filing No. 65-1 at 13-14.] He received an "AVERAGE" rating in the remainder of the categories. [Filing No. 65-1 at 13-14.] At the end of the 2008-2009 school year, MCS informed Mr. Mitchell that "due to your excessive absences for 08/09, your reappointment for 09/10 is being approved contingent on improvement in your attendance." [Filing No. 65-1 at 15.]

On June 2, 2009, Mr. Mitchell wrote a detailed letter to Associate Superintendent Burkhart in which he disputed many of the statements in his Letter of Reprimand and Evaluation Form. [Filing No. 64-5.] For example, Mr. Mitchell stated that he cleaned the gym on May 31, 2009 (a Sunday that he worked overtime, on which Ms. Crump claimed he did not complete numerous assigned tasks), but did not push the bleachers back or put down the basketball goals because he did not know how to do it and had not been trained to do so. [Filing No. 64-5 at 1.] Mr. Mitchell expressed that he was upset with his negative evaluation, had not received proper training, and had "been harassed by certain individuals which has worked it's (sic) way to other co-workers and to the front office and I don't like it one bit." [Filing No. 64-5 at 2.]

### C. 2009-2010 School Year

Mr. Mitchell was again assigned to Central High School for the 2009-2010 school year. [Filing No. 65-1 at 16.] On April 8, 2010, Tom Jarvis, the Athletic Director at Central High School, and Joe Martinez met with Mr. Mitchell at Mr. Jarvis' request. [Filing No. 65-1 at 17-20.] Mr. Jarvis gave Mr. Mitchell a custodial area inspection report, which reflected that Mr. Jarvis was not pleased with Mr. Mitchell's work. [Filing No. 65-1 at 17.] Mr. Mitchell became upset, and said "F*** this," "f*** you!," and "I'm going to lose my temper and you don't want to see me lose my temper." [Filing No. 65-1 at 19.] Mr. Jarvis then showed Mr. Mitchell the areas he had not cleaned, and Mr. Mitchell made excuses. [Filing No. 65-1 at 19.] Mr. Martinez informed Mr. Mitchell at the same meeting that Mr. Martinez would be issuing a Performance Correction Notice because Mr. Mitchell was clocking in for his shift early and leaving early, despite warnings not to do so. [Filing No. 65-1 at 17-22.] Mr. Mitchell again became upset and said "F*** you!" and "I'm going to get you!" in response. [Filing No. 65-1 at 19.]

Additional disciplinary incidents took place during the 2009-2010 school year, which both MCS and Mr. Mitchell documented:

- On April 13, 2010, Mr. Jarvis and Mr. Martinez met with Mr. Mitchell to give him the Performance Correction Notice and his annual evaluation. Mr. Mitchell became upset, defensive, and made excuses for the appearance of his work area. Mr. Jarvis told Mr. Mitchell that he had to do a better job communicating with co-workers, and Mr. Mitchell admitted that he did not call the appropriate person when absent, as required. [Filing No. 65-1 at 20; Filing No. 65-1 at 35-37.]

- An April 16, 2010 inspection of Mr. Mitchell's area revealed that it was dirty and some sections had trash on the floor. [Filing No. 65-1 at 38-44; Filing No. 65-1 at 53.]

- On April 16, 2010, Mr. Mitchell responded to his April 13, 2010 Performance Correction Notice and evaluation, stating that he felt the evaluation was "unfair" because the area he was assigned "was already in bad shape and now I'm expected to work miracles." [Filing No. 64-5 at 3.] Mr. Mitchell stated that no one ever gave him specific instructions regarding his area, that he did not have a key to the auditorium dressing rooms so could not clean them, that the bathroom floors are in bad shape and all he can do is mop them, that he gets along with everyone but "don't take any crap from anybody regardless who it is," that "if my addressing certain issues offends some people then that's too bad," that there was a general lack of communication, and that he has clocked in and out early and was "using time management" and if that "is a violation then so be it." [Filing No. 64-5 at 3.]

- In April 2010, Paul Dytmire, another MCS custodian who worked with Mr. Mitchell at Central High School, documented his interactions with Mr. Mitchell. This documentation revealed that: in June 2009, Mr. Mitchell called Mr. Dytmire and another co-worker a "motherf***er" and said that he would "[f]*** everybody that worked here"; in March 2010, Mr. Dytmire told Mr. Mitchell that they were not supposed to clock in early, and Mr. Mitchell responded by saying "f*** Joe [Martinez]"; Mr. Dytmire referred to other situations where Mr. Mitchell had sworn about or threatened other employees. [Filing No. 65-2 at 3-4.]

- Also in April 2010, Dan Justice, the Supervisor of Custodial and Maintenance Services at MCS, set forth numerous occasions in which Mr. Mitchell altered his work shift without supervisor permission. [Filing No. 65-1 at 45-50.]

- On May 6, 2010, Lon Sloan, Director of Facilities at MCS, wrote a memo to Associate Superintendent Burkhart stating that Mr. Mitchell was not working to expectations or giving adequate effort to clean his area, does not adhere to employee rules, fails to comply with requests made by supervisors, does not

accept correction or direction from supervisors, and has made threatening and aggressive statements to his supervisors and co-workers. [Filing No. 65-1 at 51.] Shortly thereafter, on May 28, 2010, Mr. Justice wrote to Mr. Sloan outlining several issues with Mr. Mitchell's performance and recommending that MCS terminate Mr. Mitchell's employment. [Filing No. 65-1 at 52-53.]

- On June 9, 2010, Mr. Justice and Mr. Martinez wrote a memo to Associate Superintendent Burkhart detailing harassing behavior that Mr. Mitchell exhibited toward fellow custodians, including blocking their access to the time clock; holding an open pocket knife; and saying he was "going to hurt" another custodian, that he is "not a person to 'F… with'," that he is "about ready to snap," and that he was going to "hold everyone hostage at the time clock some day." [Filing No. 65-1 at 54-55.] Mr. Hill, one of the Mr. Mitchell's co-custodians, stated in a Declaration that he knew Mr. Mitchell "did not have a knife at the time clock because [he] was standing right next to [Mr. Mitchell]…." [Filing No. 75-1 at 3.]

- On June 17, 2010, Associate Superintendent Burkhart sent Mr. Mitchell a letter outlining some immediate expectations that MCS had set for Mr. Mitchell based on his "troubling" job performance: (1) that he establish himself as an excellent employee and co-worker at his new assignment at Southside High School; (2) that he "embrace and accept constructive criticism of [his] work"; and (3) that he "avoid confrontation." [Filing No. 65-1 at 56.]

### D. 2010-2011 School Year

MCS assigned Mr. Mitchell to Southside High School for the 2010-2011 school year and, for a period, Mr. Mitchell's job performance and attitude improved. [Filing No. 65-1 at 58-59.] Mr. Mitchell's annual evaluation indicated improvement, [*see, e.g.*, Filing No. 76-1 at 1-2], and Chuck Reynolds, Associate Principal at Southside High School, requested that MCS reassign Mr. Mitchell to that same school for the following school year, [Filing No. 65-1 at 58-59]. Mr. Mitchell was assigned five rooms in addition to the rooms that his predecessor was in charge of cleaning and, although the custodians would help each other with their work area, Mike Pratt, Mr. Mitchell's fellow custodian, stated in a Declaration that Mr. Martinez told him not to help Mr. Mitchell. [Filing No. 75-3 at 3.]

### E. 2011-2012 School Year

During the spring semester of the 2011-2012 school year, while still assigned to Southside High School, Mr. Martinez documented a meeting he had with Mr. Reynolds and Mr. Mitchell regarding Mr. Mitchell's job performance. [Filing No. 65-1 at 60.] Mr. Martinez noted that teachers had complained that Mr. Mitchell was not cleaning his areas and was retaliating against teachers who had complained about him by placing balls of paper on their desk and, in one case, in a teacher's cup. [Filing No. 65-1 at 60.] He stated that Mr. Mitchell responded that he tries to do his best, but that he is sometimes overwhelmed by the mess that is left in some classrooms, and that he left the paper balls on desks to show the teachers what he has to pick up on a daily basis. [Filing No. 65-1 at 60.] He denied placing anything in a teacher's cup. [Filing No. 65-1 at 60.] Mr. Mitchell stated that he would not leave any paper balls in the future, and that he would try to do a better job. [Filing No. 65-1 at 60.]

In August 2012, Mr. Mitchell wrote a letter detailing a July 27, 2012 incident, although it is not clear from the document to whom it was sent or if anyone at MCS received it. The letter states:

> On Friday, July 27th 2012 me and my co-workers were discussing the overtime draw and the present procedure used. Some of us didn't agree with each other and it got a little tense. After we split up I went one way with Jeff Bell and the others Keith, Mark and Patricia went the other way.
>
> Keith evidently still upset said something that Patricia didn't like. He told Mark "that f------ Monkey always want his way". Patricia who was right there told Mark she was offended by that statement and he didn't respond. Then she told Susan Earls in the office.
>
> I didn't know anything about this until Patricia told me she was offended by what Keith said but wouldn't tell me what it was. I then ask Mark what did Keith say and he told me and then Patricia told me the whole thing.
>
> Monday and Tuesday July 30 and 31st the principals were out of the office to talk about it. On Wed. Aug. 1, Joe came into the building and I told him what was said

and that I didn't appreciate it.  He left the building and came back and suggested I go to the AD building and talk with Mr. Sloan.  I told him I was going to wait and talk to Mr. Moore tomorrow.

[Filing No. 74-1 at 23.]

### F.  2012-2013 School Year

Mr. Mitchell was assigned to Southside High School again for the 2012-2013 school year.

[Filing No. 76-1 at 5.]  On February 8, 2013, Mr. Mitchell filed a Charge of Discrimination with the EEOC in which he stated:

> In August 2012 I was denied a shift change that was given to Jeff Bell (race, White).  By policy Mr. Bell was ineligible due to part time status.  Charles Cates (race, Black) was denied the position due to his being part time.
>
> There are no race, Black, custodians on the day shift or in the maintenance positions.  I have been denied other day shift positions in the past.  In 2011 I was not allowed a maintenance position due to not having 10 years (sic) experience.  After pointing out that policy ruled out all of the race, Black, applicants, the superintendent removed that qualification, but when I reapplied the position was removed and never formally filled.
>
> I believe that I have been discriminated against due to my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Filing No. 65-9.]

In April 2013, MCS issued a Performance Correction Notice to Mr. Mitchell which outlined several issues including that Mr. Mitchell did not pick up the outdoor section of his assigned cleaning area, that he did not clean a room that was to be used for a meeting before the meeting took place, and that he repeatedly clocked in and out early.  [Filing No. 65-1 at 61-63.]  When Mr. Justice met with Mr. Mitchell to go over the Performance Correction Notice, he informed Mr. Mitchell that further problems could result in Mr. Mitchell's termination.  Mr. Mitchell was adversarial and defensive, refused to sign the Performance Correction Notice, and immediately left for the day.  [Filing No. 65-1 at 63-65.]

Mr. Mitchell addressed the Performance Correction Notice in an April 13, 2017 memo that he gave to Mr. Martinez, Associate Superintendent Burkhart, and Mr. Justice, among others. [Filing No. 64-5 at 4.] Mr. Mitchell stated that he did clean the room that was being used for the meeting, and never heard anything about not cleaning the room until he was called into a meeting with Mr. Justice, Assistant Principal Gerry Moore, and Mr. Martinez. [Filing No. 64-5 at 4.] Mr. Mitchell stated that another custodian had told him that he would pick up the outdoor section, and that the custodian told Mr. Mitchell "not to worry about the outside because it was by Principal Thompson's window and she don't like you and I can get some brownie points but don't tell anybody." [Filing No. 64-5 at 4.] Finally, Mr. Mitchell stated that "[l]ater that day I found out Mark Williams called Eddie Furnace (white PT custodian) and asked why he didn't clean the Hospitality room and he said he did. Nothing more was said about it and he was never questioned or disciplined like I was." [Filing No. 64-5 at 4.]

### G. 2013-2014 School Year

Mr. Mitchell was assigned to Northside Middle School for the 2013-2014 school year, and received all "AVERAGE" ratings on his Staff Evaluation Form with the exception of "GOOD" ratings for dress, personal cleanliness, attends school-sponsored activities, cleaning of drinking fountains and lavatories, care of chalkboards, and cleaning and care of light fixtures, and a "FAIR" rating for performs housekeeping duties that are not on daily schedule (e.g., corners, under desks, tops of tables). [Filing No. 76-1 at 9-10.]

### H. 2014-2015 School Year and Mr. Mitchell's Termination

MCS assigned Mr. Mitchell to Mitchell Elementary School for the 2014-2015 school year. [Filing No. 65-1 at 67.] In November 2014, Jason Rees, Principal of Mitchell Elementary School, wrote a memo to Mr. Mitchell stating that it was reported that Mr. Mitchell was observed with a

cigar in his mouth on school grounds while he was clocked in and working, and that he also was observed talking on his cell phone while working – both of which are violations of school policy. [Filing No. 65-1 at 68.][2]

On Friday, January 9, 2015, Mr. Mitchell and Head Custodian Kimberly Frasier got into a heated argument. [Filing No. 65-1 at 74.] Mr. Mitchell described the incident in a January 12, 2015 memo to Facilities Supervisor Mike Austin, Associate Superintendent Burkhart, and Mr. Martinez, among others:

> Today I was suspended with pay by Joe Martinez for an incident that occurred on Friday, January 9[th] at Mitchell Elementary. The incident was between me and a coworker named Kim Frazier the day shift custodian. Joe didn't want to hear my side of the story and said it was under investigation, but here it is anyway.
>
> When I reported to work on Friday, Kim approached me in a room I was cleaning and asked me to come to the custodial room because she had some things to talk about. I told her we could talk here. She said Mike Austin wanted her to show me how to turn the water off in case the pipes froze so I said OK and she showed me. Then she said we need to go over this to do list and I told her "I wasn't going over the list because I do my job." Then she got upset and started yelling at me and said "well I'm telling Jason , Mike and Joe." I said "I don't give a damn who you tell, I do my job". Then Kim said "Oh you going to do it, if you don't want to do your job just quit, they don't like you anyway". Then I said "you can't make me quit, I do my job", then she said "you are worthless and everyone knows you're worthless you worthless nig.." and she caught herself. Then I stood in the doorway and blocked her exit and said "you want to call me a nig*** don't you?" Then she said "get out of my way I'm going to tell Jason". I told her "I don't care if your husband is a policeman" then I let her by and she started to the office then I went and told two teachers (Mrs. Lowe and Mrs. Hans) that she wanted to call me a nig***. After that I didn't see Kim or the principal Jason. Then Joe shows up on Monday to suspend me and took my keys.

---

[2] Mr. Mitchell claims in his Response to MCS's Motion for Summary Judgment that he does not smoke, no one has ever seen him smoke, and that the cigar was a "rubber cigar" that he was chewing on. [Filing No. 75 at 6.] Mr. Mitchell does not cite to evidence for this claim, and merely states that it is his "own personal statement" though he provides no declaration or affidavit attesting to the fact. [Filing No. 75 at 6.] Accordingly, the Court cannot and will not consider it.

I figure Kim was upset that I missed Wednesday (1/7) and Thursday (1/8) and checked my area for things to put on her to do list. I have never had any complaints from teachers, in fact they all say I have done the best work they have seen in a while. I never go in Kim's area and make lists and if she has concerns she needs to take it up with our supervisor. Kim is not my supervisor and I don't have to take orders from her. Here again you believe the white woman's story before the black man as usual.

[Filing No. 65-1 at 74.]

Ms. Frasier also documented the incident:

On Tuesday 1-06-15 I received the email on Extreme Weather Procedures, but wasn't able to hand deliver it to James as requested until Friday 1-9-15. James had called in sick on Wednesday and took a vacation day on Thursday. Prior to speaking to James I had noticed that there were several areas not being cleaned by James as I was going through the classrooms to open the doors and sink cabinets. I made a list of the things that need attention. About 2:30 on 1-9-15 I went to find James to go over the weather procedures and the list I had made. I found him in a classroom and told him that I had a couple of things to go over with him I had the two papers in my hand. He blew me off by telling me to just put it on his desk.

I said no it was the Extreme Weather Procedures and I was told to hand deliver it. He become angry and wanted to know who told me to hand deliver it. I said that it was emailed to all Head Custodians from Mike Austin and I then attempted to provide him with the Information on what we needed to do. He told me again to put it on his desk. I continue with trying to provide the Information and asked James if he knew where the main water shut off was to the building. His response was no and I told him that was why we were doing this, so if anything happened he would know what to do. I told him to come to the boiler room with me and I would show him where everything was.

After showing him the shut off valves I said that part of my job was to go around in the mornings to all the rooms and check for water leaks from the classroom sinks, restrooms etc. and that I had noticed that there were several areas not being cleaned. I told him I have a list of things that need attention. He blew up and said "Fuck You I ain't doin' that, throw that away, you and Jason both can Fuck Off and stop telling me how to do my job". He continued to rant telling me that I needed to do my own Fucking job and stop checking on him. He just kept mumbling "Fuck You - Fuck Off he wasn't doing it".

- 18 -

At that point I had had enough and I told him that he was a lazy, worthless piece of shit and he needed to quit and give the job to somebody that wanted to do it. He told me "Fuck You" again. James walked over to the boiler room door like he was exiting, as I walked up behind him to leave he just stood there blocking the doorway. He turned his head to me and said, "Fuck You I don't care if your husband is a policeman ". I had to reach around him to open the door to exit the room and I then went to the Office.

After Mr. Rees came in from dismissing the students I told him what that happened. I am done with James; I can no longer work with him. His angry reactions to my efforts to give him direction scare me.

[Filing No. 65-6 at 3.]

After the argument, Mr. Mitchell continued with his custodial duties and told two teachers about the argument while he was cleaning their rooms. [Filing No. 65-4 at 8.] Mr. Mitchell told the teachers that Ms. Frasier "was getting ready to call me a [ni****]," and "stopped herself, but I knew. She didn't stop herself far enough that I didn't know." [Filing No. 65-4 at 8.] Mr. Mitchell did not immediately tell any other MCS employees about Ms. Frasier's language, including Human Resources. [Filing No. 65-4 at 10-11; Filing No. 65-4 at 15-17.]

For her part, Ms. Frasier spoke with Principal Rees after the argument and told him that she could no longer work with Mr. Mitchell and that his reaction to her attempt to give him directions scared her. [Filing No. 65-5 at 3; Filing No. 65-6 at 3.] Ms. Frasier admitted that she called Mr. Mitchell "a lazy, worthless piece of sh**" and told him that he "needed to quit and give the job to somebody that wanted to do it." [Filing No. 65-5 at 3; Filing No. 65-6 at 2-3.]

On the following Monday, January 12, 2015, Mr. Martinez met with Mr. Mitchell. [Filing No. 65-4 at 11-12.] Mr. Martinez told Mr. Mitchell that MCS had suspended him and he was to turn in his keys. [Filing No. 65-4 at 11.] That same day, Principal Rees spoke with Ms. Frasier about the argument with Mr. Mitchell and told her that she should not have called Mr. Mitchell "a

lazy, worthless piece of sh**" and should not speak to people in that way.  [Filing No. 65-5 at 3.]

Ms. Frasier agreed and apologized to Principal Rees.  [Filing No. 65-5 at 3.]

On January 13, 2015, Mr. Mitchell received an email from Associate Superintendent Burkhart confirming that Mr. Mitchell was indefinitely suspended without pay pending a review of his entire employment history with MCS.  [Filing No. 65-1 at 75.]  On January 22, 2015, MCS informed Mr. Mitchell that his employment with MCS was immediately terminated.  [Filing No. 65-1 at 76.]

Mr. Mitchell filed a Charge of Discrimination with the EEOC on January 23, 2015, the day after his termination, stating:

> I have been a custodian for [MCS] since 2008.  In August 2014 I was transferred to Mitchell Elementary School to work second shift.  On Friday, January 9, 2015, a white coworker, Kim, and I got into an argument.  She starts to call me a ni[****], but stopped at "nig."  I complained about this to two teachers, Ms. Lowe and Ms. Hahn.  On January 12, 2015 my supervisor, Joe Martinez, suspended me pending investigation for the incident with Kim on Friday.  I told Joe that Kim called me worthless and almost called me a ni[****].  He said it is under investigation and I am suspended until further notice.  I have not been contacted by the school since.
>
> I believe I have been suspended due to my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Filing No. 65-10.]

On February 5, 2015, MCS issued a written Letter of Reprimand to Ms. Frasier regarding her comment to Mr. Mitchell during the January 9, 2015 argument.  [Filing No. 65-6 at 4.]  This was the first and only time MCS had disciplined Ms. Frasier during her employment.  [Filing No. 65-6 at 2.]

On May 8, 2015, Mr. Mitchell filed a Charge of Discrimination with the EEOC in which he stated:

I have been a custodian for [MCS] since 2008. On Friday, January 9, 2014, a white coworker, Kim, and I got into an argument. She started to call me a ni[****], but stopped at Nig.

I complained about this to two teachers, Ms. Lowe and Ms. Hahn. On January 12, 2014, supervisor, Joe Martinez, suspended me pending investigation for the incident with Kim on Friday. I told Joe that Kim called me worthless and almost called me a ni[****]. He said it is under investigation and I am suspended until further notice.

I received a letter dated January 22, 2015, terminating my employment. Kim was not disciplined.

[Filing No. 64-3.]

## I. The Lawsuit

Mr. Mitchell initiated this lawsuit on November 30, 2015 and filed the operative Amended Complaint on March 23, 2016. [Filing No. 1; Filing No. 27.] After several Motions to Dismiss, his claims against MCS for race discrimination and retaliation remain. [*See* Filing No. 35; Filing No. 42.] The parties have each moved for summary judgment, [Filing No. 64; Filing No. 65], and the motions are now ripe for the Court's decision.

## IV.
### DISCUSSION

### A. Due Process Claim

In his brief in support of his Motion for Summary Judgment, Mr. Mitchell refers to the Due Process Clause of the United States Constitution and argues that he did not receive due process because "[t]he process of [his] termination was not handled fairly or in a way that other terminations were handled." [Filing No. 64 at 2-3.] MCS argues in response that it did not violate Mr. Mitchell's due process rights because Mr. Mitchell did not have a protected property interest in his employment since he was an at-will employee, and because he was able to present his version of events prior to his termination. [Filing No. 72 at 13-15.]

Mr. Mitchell vaguely referred to due process in his Amended Complaint, stating that he "was not given due process to present my side of the story to any claims made by my supervisors…. Not once did [the Director of Human Resources] come and talk to me first." [Filing No. 27 at 4.] The Court does not construe Mr. Mitchell's Amended Complaint as alleging a claim for violation of his due process rights, and is puzzled by the parties' discussion of a due process claim because the Amended Complaint has not been characterized by the parties as raising such a claim up to this point. [*See, e.g.*, Filing No. 30 at 3 (MCS stating in its Motion to Dismiss that Mr. Mitchell's original Complaint set forth claims for hostile work environment, race discrimination, and retaliation, and that the Amended Complaint added several individual Defendants); Filing No. 33 (Mr. Mitchell only mentioning hostile work environment, race discrimination, and retaliation claims in response to MCS's Motion to Dismiss). Out of an abundance of caution, however, the Court will address a procedural due process claim.

The Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. In order to succeed on a procedural due process claim, Mr. Mitchell must establish: "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010). The protected property right or interest must be one in which Mr. Mitchell "claims to have been denied without due process." *Id.* In order for an employee to show that he has a protectable property interest in his continued employment, he must identify an independent source, such as state law or an employment contract, which created the property interest. *See Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007); *Swick v. City of Chicago*, 11 F.3d 85, 86 (7th Cir. 1993).

An at-will employee does not have a protected property interest in continued employment. *Wingo v. City of South Bend*, 444 Fed. Appx. 90, 91 (7th Cir. 2011) (affirming grant of summary judgment in favor of employer where employee was an at-will employee and had not established "any protected property interest in continued employment"). Mr. Mitchell does not make any effort to explain why he had a protected property interest in continued employment, nor even assert that that is the case. Accordingly, any due process claims that he has alleged – based on a liberal reading of the Amended Complaint – fails as a matter of law.

## B.  Race Discrimination Claim

In support of his race discrimination claim, Mr. Mitchell argues that his "charge of discrimination is legitimate" because he is a member of a protected class, that MCS "did not allow [him] to meet [its] legitimate job expectations," that co-workers used derogatory language and pictures to offend him, that administrators did not address issues and did not use a diversity and sensitivity program, and that he suffered an adverse employment action when he was terminated. [Filing No. 64 at 3-7.] Mr. Mitchell contends that other white custodians were "able to keep and receive more favorable treatment…[e]ven though they practiced inappropriate behavior," and lists several individuals and their circumstances but does not provides any citations to the record. [Filing No. 64 at 4-6.] Mr. Mitchell argues that he was "always treated differently than other employees who had violations more serious than mine," and that "[t]he confrontation between me and Kim Frasier that [led] to my termination was just the fuel MCS needed and wanted to get rid of me." [Filing No. 64 at 9.]

MCS argues in response and in support of its own Motion for Summary Judgment that Mr. Mitchell cannot prove race discrimination under the direct method of proof because he has not presented evidence indicating a basis for an inference of intentional discrimination. [Filing No.

67 at 17-18.] MCS also contends that Mr. Mitchell appears to address the indirect method of proof, and cannot satisfy the requirements for a prima facie case of discrimination or show that MCS's decision was pretextual. [Filing No. 67 at 18-28; Filing No. 72 at 15-24.] Specifically, MCS argues that Mr. Mitchell has not shown that he was meeting MCS's legitimate employment expectations, and also contends that Mr. Mitchell has not shown that MCS treated similarly situated non-African American employees more favorably nor that MCS's decision to terminate him was a pretext for discrimination. [Filing No. 72 at 15-24.]

In response to MCS's Motion for Summary Judgment and in reply in support of his own motion, Mr. Mitchell argues that he was meeting MCS's legitimate job expectations, that MCS has not proven what their job expectations were, and that white custodians received more favorable treatment than he did. [Filing No. 75 at 8-13.]

Title VII of the Civil Rights Act of 1964 forbids an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-2(a)(1)). A plaintiff may prove claims of race discrimination under either the direct or indirect method of proof. *Antonetti*, 563 F.3d at 591. The Seventh Circuit recently instructed that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded but no evidence should be treated differently from other evidence because it can be labeled 'direct' or

'indirect.'" *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[3]  In short, "all discrimination claims present the same basic legal inquiry:  At the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint School District*, --- F.3d ----, 2017 WL 2627820, *4 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).

Under the indirect method, a plaintiff can rely on the *McDonnell Douglas* burden-shifting method of proof. *Antonetti*, 563 F.3d at 591 (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  To establish a prima facie case of race discrimination, a plaintiff must show that: "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Ferrill*, 2017 WL 2627820 at *4.  A plaintiff need not show that he was meeting his employer's expectations "when he alleges that

---

[3] *Ortiz* disapproved of prior efforts on the part of district courts to "shoehorn all evidence into two 'methods,' and [their] insistence that either method be implemented by looking for a 'convincing mosaic,'" because that approach "detracted attention from the sole question that matters: Whether a reasonable juror could conclude that [plaintiff] would have kept his job if he [was not a member of a protected class] and everything else had remained the same…."  This Court reads *Ortiz* as a shift from treating "direct" and "indirect" evidence differently, and not as creating a standard different from the two-option test whereby a plaintiff can either prove discrimination by the "direct method," or the "indirect burden-shifting method" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ortiz*, 834 F.3d at 766 ("Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand.  We are instead concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently.  Instead, all evidence belongs in a single pile and must be evaluated as a whole"); *Ferrill v. Oak Creek-Franklin Joint School District*, --- F.3d ----, 2017 WL 2627820, *4 (7th Cir. 2017) ("Nothing in *Ortiz*, however, displaced the burden-shifting analysis established in *McDonnell Douglas*…."); *David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*Ortiz*, however, did not alter '[t]he burden-shifting framework created by *McDonnell Douglas*….'  As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases").

other employees were also not meeting the employer's expectations but the employer selectively punished the plaintiff, or punished the plaintiff more severely, for discriminatory reasons." *McNair v. Bonaventura*, 46 Fed. Appx. 849, 852 (7th Cir. 2002).

If the plaintiff meets that burden, then the employer must "set forth a legitimate nondiscriminatory reason for [the adverse employment action] which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols v. Southern Illinois University – Edwardsville*, 510 F.3d 772, 783 (7th Cir. 2007) (citation and quotation omitted). If the employer satisfies its burden, the burden shifts back to the plaintiff who must then prove that the proffered reason was pretextual. *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001) (citation omitted). Pretext is defined as "a dishonest explanation, a lie rather than an oddity or an error." *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)). To establish pretext, the plaintiff must show either that the employer was motivated by a discriminatory reason or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003). An employer's changed reasoning or failure to proffer an explanation when given an opportunity to do so can be evidence of pretext. *Id.*

The Court will analyze this case as it has other employment discrimination cases, keeping in mind the Seventh Circuit's admonition in *Ortiz* to consider all evidence as a whole, rather than categorizing evidence by type. Mr. Mitchell does not specify whether he proceeds under either the direct or the indirect method of proof, so the Court will consider whether his race discrimination claim survives under either standard.

### 1. *Direct Method*

Under the direct method of proof, courts should consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

The Court finds that Mr. Mitchell has not pointed to any evidence to support his race discrimination claim under the direct method of proof. The only evidence Mr. Mitchell has set forth that could potentially implicate race are his contentions that a co-worker referred to him as a "f----- Monkey" in July 2012 and that Ms. Frasier – a fellow custodian – started to call him "ni****" and stopped mid-way through saying the word. Even viewing these contentions in the light most favorable to Mr. Mitchell, it is well settled that "[d]erogatory statements made by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory." *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005). Likewise, "'stray remarks' in the workplace…are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). Mr. Mitchell does not allege that "Keith" or Ms. Frasier made the decision to terminate his employment. Indeed, Ms. Frasier also was disciplined in connection with the exchange that preceded Mr. Mitchell's termination. [Filing No. 65-6 at 4.]

Mr. Mitchell has not presented evidence sufficient to support his race discrimination claim under the direct method of proof. The Court will consider, however, whether his claim succeeds under the indirect method of proof.

## 2. Indirect Method

To establish a prima facie case of race discrimination under the indirect method of proof, Mr. Mitchell must show that: "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Ferrill*, 2017 WL 2627820 at *4. The elements the parties dispute here are whether Mr. Mitchell was meeting MCS's expectations, and whether MCS treated similarly situated individuals outside the protected class more favorably than it treated Mr. Mitchell. If Mr. Mitchell can establish a prima facie case of discrimination, MCS must "set forth a legitimate nondiscriminatory reason for [the adverse employment action] which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols*, 510 F.3d at 783 (citation and quotation omitted).

### a. Meeting Job Expectations

Mr. Mitchell argues that MCS did not allow him to meet its legitimate job expectations because it did not "maintain professional employee relations and maintain a positive working environment as indicated in the MCS Employee Handbook…." [Filing No. 64 at 4.] He also argues that he did, in fact, meet MCS's legitimate job expectations because MCS "did not dispute my unemployment benefits and my termination was ruled by the Indiana Workforce Development, that I was not terminated for just cause which would conclude that my work performance was a non issue," that MCS gave him a job assignment every year, and that MCS "has not proved what their legitimate job expectations are." [Filing No. 75 at 8.]

The problem with Mr. Mitchell's arguments is that MCS has provided extensive documentation reflecting instances where Mr. Mitchell was made aware of performance issues and, in many cases, disciplined. These instances include the following:

- Not keeping his area properly cleaned, [Filing No. 65-1 at 10-12];

- Not completing other tasks to which he was assigned, [Filing No. 65-1 at 10-12];

- Losing his temper and swearing at co-workers and supervisors, [Filing No. 65-1 at 19-20];

- Not calling the appropriate person when absent, [Filing No. 65-1 at 20];

- Altering his work shift without supervisor permission, [Filing No. 65-1 at 45-50];

- Being caught on video with a cigar in his mouth while working, [Filing No. 65-1 at 68];

- Being caught on video talking on his cell phone while working, [Filing No. 65-1 at 72-73];

- Retaliating against teachers by leaving trash on their desks, [Filing No. 65-1 at 60];

- Blocking other employees from reaching the time clock while holding a pocket knife, [Filing No. 65-1 at 54-55]; and

- Engaging in a heated argument with Ms. Frasier, [Filing No. 65-1 at 74].

The Court does not find it significant that MCS kept Mr. Mitchell on as a custodian for several years. During that time, Mr. Mitchell was reassigned three times and was given numerous warnings and chances to improve his performance. Additionally, Mr. Mitchell's vague argument that he did not receive sufficient training so could not perform his job duties adequately is not supported by record evidence. Based on the undisputed admissible evidence, no reasonable jury could find that Mr. Mitchell was meeting MCS's legitimate job expectations. *See Ferrill*, 2017 WL 2627820 at *4 ("The uncontroverted evidence all points in one direction: [Plaintiff's] job

performance during her two years at Edgewood was fraught with problems and fell well below the district's legitimate expectations, creating serious erosion in morale at the school.  Staff repeatedly complained that her management style was confrontational and inconsistent, and she was sometimes nonresponsive.  She was prone to hostility toward opposing viewpoints and quick to intimate that those around her were racist").

Although the Court could stop its analysis here, as Mr. Mitchell cannot meet one of the requirements for setting forth a prima facie case of race discrimination, it will also consider whether MCS treated similarly situated employees outside of the protected class more favorably than Mr. Mitchell.

b.  Similarly Situated Employees

Mr. Mitchell argues that MCS treated white custodians more favorably than him, "[e]ven though they practiced inappropriate behavior," and sets forth those individuals and their perceived shortcomings including:

- Patricia Boggan – a white female custodian who Mr. Mitchell claims "was using derogatory speech" that offended him and the administration knew about it and did not do anything, and who removed her time card and left the building on several occasions but was not disciplined;

- Keith Cartwright – who Mr. Mitchell claims would use derogatory language that offended Mr. Mitchell but was never disciplined;

- Nathan Heffernan – a white male custodian who Mr. Mitchell claims "was in possession of stolen guns and never got disciplined for violating school policy";

- Jack McCoy – a white male custodian who Mr. Mitchell alleges was accused of sexual harassment and was never disciplined;

- Jason Cole – a white male custodian who Mr. Mitchell contends stole medication from school property but was not disciplined;

- Debbie Badders – a white female custodian who Mr. Mitchell contends falsely reported that he had a knife and was never disciplined for the false report;

- Kevin Shelton – a biracial male who Mr. Mitchell contends was terminated for unsatisfactory work but was "given the opportunity to talk[ ] with Kathy Ray the HR Director before he was terminated;

- Jenny Locke, who Mr. Mitchell claims falsely reported that he had a knife and was never disciplined for the false report;

- Michael Pratt – a white male who Mr. Mitchell claims was "given due process when he was terminated for his unsatisfactory work record."

[Filing No. 64 at 5-6; Filing No. 75 at 9-10.]

Despite this list, Mr. Mitchell has not set forth similarly situated individuals, outside of the protected class, who were treated more favorably than he was. First and foremost, Mr. Mitchell does not provide admissible evidence to support his arguments regarding the majority of the individuals he lists. He does not submit any evidence regarding Patricia Boggan,[4] Nathan Heffernan, Jenny Locke, and Jason Cole. Further, Mr. Mitchell does not state, or provide evidence indicating, what race Keith Cartwright and Ms. Locke are, so they are not sufficient comparators since he has not established that they are outside of the protected class. [Filing No. 75 at 9.]

As far as the other individuals Mr. Mitchell lists, he does not provide evidence showing that they were similarly situated to him. Mr. Mitchell provides Mr. McCoy's Declaration to support his argument that Mr. McCoy was accused of sexual harassment and had the opportunity to talk with MCS's Human Resources Director and was moved to a different school while he was being investigated. [*See* Filing No. 75 at 10 (referencing Filing No. 75-2).] While Mr. McCoy's Declaration states that he was informed by the Human Resources Director that he was being moved

---

[4] Mr. Mitchell cites to Exhibit 20 in his response brief for the proposition that "Patricia Boggan and Keith Cartwright would use derogatory language to offend me as well as others but they were never disciplined per discovery." [Filing No. 75 at 9.] Exhibit 20, however, consists of typewritten notes by Mr. Mitchell which state that "Patricia" was offended by comments made by a co-worker, would not tell Mr. Mitchell at first, but then told him about the incident. Exhibit 20, if it is even admissible, does not support Mr. Mitchell's statements regarding Ms. Boggan.

to another school because he was being investigated for a sexual harassment claim, the Court fails to see how this shows that Mr. McCoy and Mr. Mitchell were similarly situated. To the contrary, Mr. McCoy's Declaration also indicates that the sexual harassment claim "turned out to be false," while the undisputed evidence shows that Mr. Mitchell was extensively disciplined for poor work performance and other issues during his tenure at MCS. As far as Ms. Badders, Mr. Mitchell provides the Declaration of John Hill and states that Ms. Badders caused Mr. Mitchell to "lose 2 day's (sic) pay for a lie that was told about a knife." [Filing No. 75 at 9 (referencing Filing No. 75-1).] Mr. Hill states in his Declaration that he "knew that [Mr. Mitchel] did not have a knife at the time clock because I was standing right next to him, and went and told Mr. Burkhart about it." [Filing No. 75-1 at 3.] Even if this statement were sufficient to show that Ms. Badders was lying about the knife incident, it does not show that she and Mr. Mitchell were similarly situated. Mr. Mitchell has not provided any evidence that Ms. Badders displayed a pattern of being disciplined over many years, as Mr. Mitchell did.

Further, Mr. Mitchell claims that Mr. Shelton was treated more favorably than him because he was given the opportunity to talk with the Director of Human Resources before being terminated and Mr. Mitchell was not. [Filing No. 75 at 9-10 (citing Filing No. 74-1 at 24-25).] MCS ultimately terminated Mr. Shelton, so he was not treated more favorably than Mr. Mitchell. Further, the evidence cited by Mr. Mitchell is a letter from the Director of Human Resources to the Superintendent which outlines Mr. Shelton's issues. It does not indicate that Mr. Shelton was given an opportunity to talk to the Director of Human Resources or received any type of "due process" that Mr. Mitchell did not. Finally, Mr. Mitchell claims that Mr. Pratt was given the opportunity to speak with the Director of Human Resources before he was terminated, and cites to Mr. Pratt's

Declaration. [Filing No. 75 at 10 (citing Filing No. 75-3 at 2-3).] But Mr. Mitchell has not provided evidence indicating why Mr. Pratt was terminated, and whether his history of discipline was similar to Mr. Mitchell's.[5]

In short, Mr. Mitchell has not presented admissible evidence of similarly situated individuals, outside of his protected class, whom MCS treated more favorably. For this additional reason, Mr. Mitchell has not set forth a prima facie case of race discrimination.

c.  Pretext

Although Mr. Mitchell has not set forth a prima facie case of race discrimination, the Court will briefly consider the issue of pretext. MCS argues it has set forth a legitimate, non-discriminatory reason for terminating Mr. Mitchell – poor job performance – and that Mr. Mitchell has not shown that reason was pretextual. [*See* Filing No. 72 at 21-22.] MCS asserts that Mr. Mitchell's "self-assessment of his own performance capabilities is immaterial to whether MCS's reasons for terminating him were a pretext for discrimination." [Filing No. 72 at 22.] MCS also contends that the decision by the Indiana Department of Workforce Development that there was not just cause for Mr. Mitchell's termination is inadmissible. [Filing No. 72 at 23.]

Mr. Mitchell argues that MCS "created a paper trail in order to paint a false perception of my work abilities," and "[t]his paper trail could give rise to an inference of pretext." [Filing No. 75 at 13.]

MCS has presented ample evidence that Mr. Mitchell had received multiple warnings regarding his poor job performance, over a long period of time, and was ultimately fired after his argument with Ms. Frasier. Mr. Mitchell's only response to his discipline history is that MCS was

---

[5] Mr. Mitchell also has not provided any legal authority suggesting that an individual is treated more favorably than another for receiving more "due process" but ultimately facing the same adverse employment action – termination.

being hard on him, and that he actually was doing his work but was set up to fail due to the atmosphere at MCS. But Mr. Mitchell's self-assessment of his performance is not enough to show that MCS's decision was pretextual. Moreover, Mr. Mitchell does not present admissible evidence to dispute the facts underlying his numerous disciplinary write-ups, but he simply suggests that the fact of the many write-ups creates an inference of pretext. Any such inference is unreasonable. Rather, MCS's view of Mr. Mitchell's performance, and its conclusion that his performance warranted termination, is what is relevant.

The Court will not second-guess MCS's decision to terminate Mr. Mitchell for poor performance, absent any evidence that MCS did not believe those reasons were legitimate. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) ("[W]e 'do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination'…. 'On the issue of pretext, our only concern is the honesty of the employer's explanation'….And there is no indication in the record that [the employer] did not honestly believe [its actions were correct]") (citation omitted); *see also Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) (in order to show pretext, it is insufficient for employee "to show that his employer [acted] for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for [its actions]"); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (finding insufficient evidence of pretext and stating "it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair").

Even assuming Mr. Mitchell could have presented a prima facie case of race discrimination, he has not presented any evidence demonstrating that MCS's reasons for terminating him were pretextual. Accordingly, his race discrimination claim fails as a matter of law, and MCS is entitled to summary judgment on that claim.

### C. Retaliation Claim

In support of his Motion for Summary Judgment, Mr. Mitchell argues that every time he would complain to his supervisor he would get moved or written up for something, and that MCS retaliated against him when he would complain about or respond to his employment evaluations. [Filing No. 64 at 7.]

MCS responds that Mr. Mitchell has not shown that he engaged in statutorily protected activity, that his complaints regarding employment evaluations or discipline took place after the evaluations or discipline so do not support a retaliation claim, and that the exhibits he relied upon are time-barred because they are not mentioned in his EEOC Charge. [Filing No. 67 at 29-31.]

The same framework that is used for evaluating race discrimination claims is also used for evaluating retaliation claims. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Under the direct method of proof, a plaintiff must show that: "(1) he engaged in [statutorily] protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two." *Id.* at 856. Under the indirect method, a plaintiff must show that he engaged in statutorily protected activity, he suffered an adverse employment action, he was meeting his employer's legitimate job expectations, and he was treated less favorably than similarly situated employees outside of the protected class. *Id.* Mr. Mitchell's retaliation claim fails because he cannot satisfy the first or third requirements under the direct method of proof, and he cannot set forth a prima facie case of retaliation under the indirect method.

First, Mr. Mitchell's complaints to two teachers that Ms. Frasier started to call him a "ni****," or other general complaints to supervisors,[6] are not statutorily protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient"). While "filing an official complaint with an employer may constitute statutorily protected activity under Title VII" if "the complaint…indicate[s] the discrimination occurred because of sex, race, national origin, or some other protected class," *id.*, Mr. Mitchell testified that he did not initially report his argument with Ms. Frasier because he thought it was "really no big incident" and "sometimes co-workers get into it." [Filing No. 65-4 at 7; Filing No. 65-4 at 25-26.] In fact, he did not notify anyone other than the two teachers about Ms. Frasier starting to call him a "ni****" until after he had been suspended by Mr. Martinez on January 12, 2015. [*See* Filing No. 65-1 at 74.] By his own characterization, Mr. Mitchell's complaint to the two teachers was not statutorily protected activity.

Mr. Mitchell also has not shown a causal connection between his activity and his termination under the direct method. To the extent Mr. Mitchell relies upon his two EEOC Charges, those are considered statutorily protected activity but they cannot support his retaliation claim because of their timing. "[S]uspicious timing alone rarely is sufficient to create a triable issue," *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 905 (7th Cir. 2005), and the Seventh Circuit Court of Appeals has held that even a time span of a little more than four months between an EEOC Charge

---

[6] To the extent Mr. Mitchell relies upon a July 27, 2012 incident where he claims that a co-worker referred to him while talking to another co-worker as a "f------ Monkey," and that Mr. Mitchell then told Mr. Martinez he "didn't appreciate it," this also does not adequately support his retaliation claim. Mr. Mitchell does not provide evidence regarding what ultimately happened with his complaint to Mr. Martinez, other than that Mr. Martinez suggested that he talk to Mr. Sloan and that Mr. Mitchell "was going to wait and talk to Mr. Moore tomorrow." [Filing No. 74-1 at 23.] Further, this incident took place more than two years before Mr. Mitchell was terminated.

and the plaintiff's termination could not support a retaliation claim.  *See Tomanovich*, 457 F.3d at 665; *Longstreet v. Illinois Dept. of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002).  Mr. Mitchell filed his first EEOC Charge in February 2013 – nearly two years before his termination, which is a significantly longer time period than the time periods the Seventh Circuit has rejected as not supporting a retaliation claim under the direct method.  He filed his second EEOC Charge on January 23, 2015 – the day after his termination – so MCS's decision to terminate him could not have been in retaliation for the filing of an EEOC Charge that had not yet occurred.  *See Tomanovich*, 457 F.3d at 664 ("[Plaintiff], however, did not file his first charge of discrimination with the EEOC until July 10, 2002, and, thus, the City's prior decision to place [plaintiff] on a performance plan on June 3, 2002, could not have been retaliatory for the later EEOC filings").

Additionally, Mr. Mitchell's retaliation claim cannot succeed under the indirect method of proof.  As discussed above, Mr. Mitchell has not shown that he was meeting MCS's employment expectations, that MCS treated similarly situated individuals outside of the protected class more favorably, or that MCS's stated reasons for terminating him were pretextual.  MCS is entitled to summary judgment on Mr. Mitchell's retaliation claim.

## V.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Mr. Mitchell's Motion to Include Exhibits With Summary Judgment Response, [Filing No. 76], as set forth above; **DENIES** Mr. Mitchell's Motion for Summary Judgment, [Filing No. 64]; and **GRANTS** MCS's Motion for Summary Judgment, [Filing No. 65].  Final judgment shall enter accordingly.

Date: 7/13/2017

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via United States Mail to:**

James E. Mitchell
217 W. Charter Dr.
Muncie, IN 47303

**Distribution via ECF only to all counsel of record**